**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| BILL JONES | CIVIL ACTION |
| *Plaintiff*, | |
| | NO. 18-2755 |
| vs. | |
| | JUDGE ZAINEY |
| NEW ORLEANS REGIONAL PHYSICIAN HOSPITAL ORGANIZATION, INC., DBA PEOPLES HEALTH NETWORK, | MAGISTRATE JUDGE NORTH |
| *Defendant* | |

**PEOPLES HEALTH NETWORK'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

New Orleans Regional Physician Hospital Organization, Inc. d/b/a Peoples Health

Network ("Peoples Health") submits the following findings of fact and conclusions of law.

**Introduction**

1.     This case arises from Peoples Health's termination of Plaintiff, Bill Jones.  Mr.

Jones was terminated on May 10, 2017, after Peoples Health found out that he was not honoring

the terms of the remote-work arrangement.  Nearly a year later, Mr. Jones sued Peoples Health

claiming that it terminated his employment in violation of the retaliation provisions of the False

Claims Act ("FCA") and the Fair Labor Standards Act ("FLSA").  Rec. Doc. 1.  Mr. Jones

voluntarily dismissed his FCA action, but maintains his FLSA retaliation claim.  Rec. Doc. 37, p.

1; Rec. Doc. 51.

**Background**

2.     Peoples Health is a managed care company that offers a Medicare Advantage Plan

to individuals who are 65 years or older. Tr. 9.[1]

---

[1] The trial transcript will be cited herein as "Tr." followed by the page number.

3.       To offer its plan, Peoples Health must maintain a contract with the Centers for

Medicare and Medicaid Services ("CMS") and comply with its regulations and other

requirements. Tr. 377.

4.       Peoples Health's Network Development Department is responsible for building a

network of providers for the Plan and maintaining the network of providers. Tr. 157.

Contracting with providers created the network of providers that the members use as part of their

benefit plans.  Tr. 10.

5.       Mr. Jones was hired in March 2013 as a Contracting Specialist in the Network

Development Department.  Tr. 223.

<u>**Contracting Specialist Responsibilities**</u>

6.       As a Contracting Specialist, Mr. Jones' job duties included contacting health care

providers to recruit them to join Peoples Health's network, and maintaining a relationship with

the providers who joined the network.  Tr. p. 224.

7.       A Contracting Specialist is required to be responsive to providers and document

those communications with providers in Peoples Health's document system called ProviderTrak.

Tr. 57-58. ProviderTrak is Peoples Health's system that records the progress of all of the

company's provider contracts.  There are a number of steps that must be completed by a

Contracting Specialist before the contract is completed.  Consistently updating ProviderTrak was

important because it makes sure a contract is flowing through each department.  If something is

not completed, it cannot move to the next step.  *Id.*

8.       Contracting Specialists are also expected to maintain working files. *Id.* at 58. The

hard-copy files are supposed to be maintained for every contract and provider.   Hard copy files

are necessary to ensure information is transferred in the event of an emergency or a shutdown, or an employee is out of the office for an extended period of time. Tr. 123-24.

### Mr. Jones' Employment from 2013-2016

9.       At the time Mr. Jones was hired, Janice Ortego was the Senior Vice President of Network Development.  Tr. 7. Ms. Ortego had been in network development for Peoples Health for her entire 21-year career with the company.  Tr. 57.  She never spent any time in human resources and never received any training in human resources.  *Id*.

10.       Anthony Bonck was Mr. Jones' initial supervisor.  Mr. Bonck is the Assistant Vice President of Network Development.  He has held this position since April 2014.  He reports to Ms. Ortego.  Tr. 99-101.  Mr. Bonck supervised Mr. Jones from March 2013 through April 2015.  Tr. 116.

11.       Mr. Bonck viewed Mr. Jones' work as "average."  While he was Mr. Jones' immediate supervisor, he wrote him up on two occasions.  The first time was in February 2015 because Mr. Jones failed to timely submit his payroll.  *See* Exhibit 1; Tr. 117.  The second time was in March 2015 when Mr. Jones failed to timely complete his compliance training modules.  Mr. Jones refused to sign this write-up.  *See* Exhibit 2; Tr. 117-18.

12.       In April 2015, Hunt Graham became manager of physician contracting, and Mr. Jones' immediate supervisor.  *See* Exhibit 72; Tr. 157.  Mr. Bonck became Mr. Graham's supervisor.  Tr. 118-19.

13.       Mr. Graham managed three contracting specialists, including Mr. Jones.  His job was to make sure the contractors completed the contracting requirements for the department.  He also performed contracting duties himself.  Tr. 156.

14.     Mr. Graham held weekly meetings with the contracting specialists he managed. In the beginning Mr. Jones was performing well, but then Mr. Graham started to notice that Mr. Jones was having problems completing items.  Tr. 158.  The issues began around October or November of 2015.  Tr. 167.

15.     In February 2016, both Mr. Graham and Mr. Bonck were concerned with Mr. Jones' job performance.  Around that time, Mr. Bonck received an email from a provider who stated that she had attempted to contact Mr. Jones several times, but he had not responded to her. *See* Exhibit 3; Tr. 120-21.  In March 2016, Mr. Bonck also received a second email, from another provider complaining that Mr. Jones had been non-responsive.  *See* Exhibit 5; Tr. 121-22.

16.     On February 8, 2016, Mr. Graham drafted a memorandum to human resources identifying the problems he was having with Mr. Jones.  *See* Exhibit 4; Tr. 169.

17.     In March 2016, Mr. Graham and Mr. Bonck met with Mr. Jones to discuss these issues and set forth their expectations.  Mr. Graham and Mr. Bonck discussed their concerns with Mr. Jones' lack of documentation for contracts in process, inconsistency in updating ProviderTrak, and his failure to communicate with providers.  *See* Exhibit 6; Tr. 122-23. Mr. Jones, however, denied he was not engaging with providers.  *Id.*

18.     After the March 2016 meeting Mr. Jones' performance did not improve.  Tr. 125-26; 173-75.  As a result, Mr. Bonck and Mr. Graham set up another meeting with Mr. Jones on the morning of May 18, 2016 to discuss ongoing concerns regarding Jones' work performance. They asked Anne Wolff, then-Director of Human Resources, to attend the meeting.  Tr. 125-26. Mr. Bonck testified that she was asked to attend because of the issues that had arisen at the prior meetings and Mr. Jones' becoming irate.  Tr. 125-26.

4

19.     Unbeknownst to Mr. Bonck, Mr. Graham, and Ms. Wolff, the meeting was secretly recorded by Mr. Jones.  Tr. 313-14.

20.     Ms. Wolff testified that she attended the meeting because she was concerned about everyone at the meeting being on the same page.  Tr. 389-90.  She said the meeting ended because Mr. Bonck had to leave early.  But Mr. Bonck and Mr. Jones were supposed to meet at Mr. Jones' desk later that day to review the hard-copy files that Mr. Jones insisted he kept at his desk.  Tr. 126.

21.     Instead of meeting with Mr. Bonck, Mr. Jones emailed Mr. Bonck to let him know that he was "not well" and "had to leave the office quickly."  *See* Exhibit 12.  Following this email, Mr. Jones did not return to the office until September 2016. Tr. 393.

22.     Though Mr. Jones left the office, Mr. Bonck went to Mr. Jones' workspace as planned. But he did not find any working files.  Instead, he found empty folders.  Tr. 127.

23.     Mr. Graham was then given permission to access Mr. Jones' emails and voicemails while he was out in an effort to make sure there weren't any provider issues.  He found that voicemails had not been returned and his mailbox was full.  Exhibit 13; Tr. 175.

## Mr. Jones Takes FMLA

24.     The day after Mr. Jones' meeting with Ms. Wolff, Mr. Bonck, and Mr. Graham, he took FMLA leave for his own serious health condition. He was given FMLA and he was paid during most of that time.  Tr. 262-63; 390-91.

25.     He was paid because he used his paid time off ("PTO").  Tr. 262-63; 390-91. Peoples Health offered a number of types of paid time off, including a vacation bank, personal, sick time, bereavement, and jury duty.  Peoples Health provided paid time off through an accrual

method.  Additionally, each year, employees are allowed to roll over one week of vacation, one week of personal, and up to four weeks of sick time. Tr. 391.

26.      Mr. Jones did not return to work following FMLA until September 2016.  Tr. 393. Before returning, Mr. Jones requested to work at home.  *See* Exhibit 18.  But this request was denied.  Ms. Ortego testified that a contracting specialist is the kind of position that needs to be performed from the office, especially because they work as a team.  Communication was important, especially in September 2016, when the company was getting close to open enrollment, the busiest time for Peoples Health.[2]  Tr.  62-63.

## The Clean Slate

27.      Upon returning to work, the CEO at the time, Carol Solomon, agreed to allow Mr. Jones to start with a clean slate.  Tr. 55.

28.      Because of the clean slate, Mr. Graham did not go back and counsel him on the issues that were raised in the May 2016 meeting. Tr. 127.  He never asked Mr. Jones to sign the counseling sheet.  Id. But, in October 2016, Mr. Graham completed Mr. Jones' annual performance evaluation.  Exhibit 20; Tr. 177. The evaluation covered the period between July 1, 2015 and June 30, 2016.  In other words, it covered the time period before Mr. Jones' FMLA leave during which Mr. Graham had expressed concerns about Mr. Jones' job performance.  Mr. Graham's evaluation of Mr. Jones' performance noted the areas in which he believed Jones needed improvement.  *Id*.

---

[2] Open enrollment is the time from October 15-December 7 when Medicare recipients have the opportunity to join a Medicare advantage plan, such as the plan that Peoples Health offers. Tr. 62-63.

## The Remote-Work Agreement

29.     On March 10, 2017, Mr. Jones' father suffered a stroke.  Tr. 248. In mid-March, Mr. Jones asked if he could work away from the office, from the hospital or skilled nursing facility where his father was hospitalized.  Tr. 250; 334-35.

30.     On March 21, 2017, Mr. Jones submitted a written request to Mr. Bonck to work remotely.  Exhibit 21; Tr. 127-28.  Mr. Bonck requested additional information so he could validate where he would be working from, if he could use Peoples Health's system while there, and if the connection would be secure.  Tr. 129.  On March 23, 2017, Mr. Jones responded that he would "have wifi access, [his] computer, and any tools necessary to continue working ProviderTrak, Amisys, email, cover sheets, calls, and communications both internally and externally." Exhibit 22; Tr. 129.

31.     At the time of the arrangement, Mr. Jones did not raise any issues with the VPN being unreliable or irrelevant to his work.  Tr. 130.

32.     Mr. Bonck emailed Mr. Jones on March 28, 2017 to confirm that Peoples Health would agree to allow him to work remotely for two weeks in a six week period and to set forth Peoples Health's expectations during the days Mr. Jones would be working remotely stating:

These are our expectations during this temporary arrangement:

- Morning Huddle – Contact Hunt every morning via phone call prior to 8:30 am to review the goals and initiatives for the day.

- Send an email to Hunt at the end of the business day when you are finished for the day and relay any potential issues, concerns, or pending items.

- Record progress by keeping a running log of transactions, communications, and work completed. This can be in bullet format by day and emailed directly to Hunt at the end of each day.

- Make sure that your timesheet is submitted on time and communicate with HR any questions prior to the due date.

- Submit weekly reports on time.

- Maintain your calendar accurately and detail when you are "out of the office."

- Leave an outgoing voicemail and email message if there are any extended times when you will not be working or are not accessible (including partial days.) Additionally, this information should be discussed with and approved by your manager in advance.

- Communicate with manager on any urgent needs that you are not able to accomplish while out of town, so that the issue may be handled timely in your absence.

Exhibit 24.

33.     Ms. Wolff helped draft the remote-work arrangement, with input from Mr.

Graham and Mr. Bonck.    Her objective was to outline the expectations for the remote work

arrangement.  Tr. 396-97.

34.     Despite not responding to Mr. Bonck's email regarding the terms of the remote-

work arrangement, Mr. Jones worked remotely the week of March 27, 2017.  Contemporaneous

with the remote-work arrangement, Mr. Graham kept a calendar to record whether Mr. Jones was

complying with the terms of the remote-work arrangement.  *See* Exhibit 28; Tr. 179.  This

calendar reflects the times Mr. Jones worked remotely and his general compliance (or non-

compliance) with the terms of the remote-work arrangement.  *Id*.

35.     Because it was important that Mr. Jones follow the requirements of the agreement

in order to work remotely, Mr. Bonck sent a follow up email to Mr. Jones asking him to confirm

8

in writing that he would adhere to them.  Exhibit 57; Tr. 133. On April 3, 2017, Mr. Jones agreed to the terms.  Exhibit 24.

36.     The week of April 3-7, 2017, Mr. Jones worked in the office.  During this week, Mr. Jones failed to timely complete a compliance training module, similar to what he had been disciplined for in 2015. Mr. Graham counseled him for this failure, but, again, Mr. Jones refused to sign the counseling form.  *See* Exhibit 26; Tr. 295.

37.     The following week, April 10-14, 2017, Mr. Jones worked remotely, but he did not comply with the remote-work arrangement.  He called Mr. Graham in the mornings, but he did not send daily emails.  Nor did he submit daily logs, as requested. Tr. 135; 180.  Mr. Bonck was suspicious that Mr. Jones may not have been working, so he requested Joshua Jones in the IT department to provide him with information regarding when Mr. Jones logged onto the VPN. Exhibit 36; Tr. 136.  The records showed he had not logged into VPN, which meant he did not do anything in ProviderTrak.  Tr. 135-36.

38.     The next week, April 17-21, 2017, Mr. Jones again worked remotely three of the five days, but again did not comply with the remote-work arrangement.  *See* Exhibit 28; Tr. 138. Mr. Jones did not submit any daily logs.  Mr. Graham testified he did not recall Mr. Jones contacting him at all those days he was out and he didn't see any business being transacted that week.  He testified that it raised a red flag. Tr. 181.

39.     On Friday, April 21, 2017, Mr. Bonck and Mr. Graham met with Mr. Jones to discuss the fact that he was not complying with the terms of the remote-work arrangement.  The purpose was to review how the remote-work arrangement was going.  Mr. Bonck told Mr. Jones that he was not following the bullet point requirements of the arrangement. Tr. 265-69. In particular, Mr. Bonck focused on the fact that he was not providing daily logs.  Tr. 140-41.

40.     Following that meeting, later that evening on the same day, Mr. Jones emailed logs for the week of April 10-14, 2017.  He did not, however, provide logs for the week of March 27-March 30, or April 18-April 20.  Tr. 140-41.  The daily logs he did provide showed "minimal" work for the week of April 10-14, 2017.  *See* Exhibit 29; Tr. 142.

41.     In addition, that same week, Mr. Graham received an email from a provider representative at Peoples Health.  *See* Exhibit 30.  As had happened before, Mr. Graham was being notified that Mr. Jones was not communicating with a provider.  The provider, Elaine Stuart, said that she had not heard from Mr. Jones and wanted to cancel her contract. This email concerned him, as, communication is important to grow and maintain network providers.  Mr. Graham forwarded this email to Ms. Ortego on April 25, 2017.  Tr. 74; 183.

### The April 24, 2017 Meeting

42.     After Mr. Bonck and Mr. Graham met with Mr. Jones on April 21, 2017, Mr. Jones requested a meeting with Ms. Ortego.  The meeting took place the following Monday, April 24, 2017, in a conference room at Peoples Health's offices.  Tr. 21.  Ms. Ortego did not tell Mr. Bonck or Mr. Graham that she was meeting with Mr. Jones that day.  Tr. 67.

43.     Unbeknownst to Ms. Ortego, Mr. Jones recorded the meeting.  The only explanation that Mr. Jones gave for secretly recording this meeting was that he had recorded several conversations with Peoples Health employees.  This is one of several audio recordings Mr. Jones provided in this case, all relating to conversations in which he knew or was aware he was about to be disciplined.  Tr. 313-14.

44.     While Mr. Jones provided an inaccurate description of the meeting, the audio recording of the April 24, 2017 meeting, attached as Exhibit 48, speaks for itself.  During the almost 30-minute meeting, the first 21 minutes was spent with Mr. Jones complaining about Mr.

Bonck's and Mr. Graham's treatment of him, how he believed the performance evaluation Mr. Graham gave him in December 2016 was unfair.  *See* Exhibit 48, Tr. 24.  Then, at 21:14, Mr. Jones complains about being required to take PTO for having a doctor's appointment.  He then mentions the Fair Labor Standards Act and questioned whether Peoples Health's paid time off policy was different than other company's PTO policies.  However, he did not tell Ms. Ortego that he believed Peoples Health's policy was illegal or violated the FLSA or any other law. *See* Exhibit 48, 21:15-23:15; Tr. 24.   Ms. Ortego did not understand that Mr. Jones was saying that he thought Peoples Health's PTO policy was illegal.  Tr. 70.

45.     The meeting ended before Mr. Jones claimed he finished discussing what he wanted to discuss because Ms. Ortego was late to another meeting.  She agreed to continue their conversation on another day.  *Id*.  But, before the meeting ended, Ms. Ortego asked Mr. Jones what were his goals of the meeting.  He said it was to be able to come to work, do my job, get my questions answered, be treated as a fair peer. She repeated them back to him.  *See* Exhibit 48, 24:22; Tr. 36.

46.     Though Mr. Jones claims to have left documents with Ms. Ortego regarding PTO and the FLSA, Ms. Ortego testified he did not.  Tr. 28.  Further, Mr. Jones admits that the audio recording captured the entire meeting.  Tr. 363.   But the audio recording does not include any indication that he handed her anything or left anything.  *See* Exhibit 48; *see also* Exhibit 46, which is the transcript of the meeting.

47.     When the meeting ended, Ms. Ortego understood that Mr. Jones wanted her to look at what was going on with him as far as his work and being able to be treated fairly, like a peer, and to do his work, and get questions answered.  In other words, the issues that he said were the goals of the meeting.  Tr. 70.

48.     Ms. Ortego's assistant would have been responsible for scheduling another meeting.  She does not remember Mr. Jones trying to schedule it.  She did not intentionally delay the meeting.  Tr. 72.

49.     Mr. Jones admits at the meeting that he "didn't accuse them in that meeting of illegal" activity, but he just asked "her as a senior director of the company in my chain of command to explain it to me so we could have a discussion." Tr. 367-368.  Mr. Jones also admits that he "didn't accuse them of breaking the law, [he] asked her about the law and how they complied with it." Tr. 368.

50.     Ms. Ortego candidly told him she was not familiar with FLSA and it would be better to take his concern to the Human Resources department.  Tr. 369.

51.     Ms. Ortego testified that afterwards, she probably mentioned the meeting to Mr. Bonck and Mr. Graham, but that she did not discuss Mr. Jones' mention of the FLSA with them. Tr. 72.

52.     Mr. Jones acknowledged that he did not raise his concerns about PTO or the FLSA with anyone else, including anyone in Human Resources department or the compliance department. Tr. 370-71. Ms. Wolff was not aware of Mr. Jones' complaints about Peoples Health's PTO policy.  He never complained to her or to anyone in the Human Resources department regarding this complaint.  Tr. 400-01.

53.     Mr. Jones also could have lodged a complaint with the Compliance Department. Peoples Health has policies on how an employee should report a compliance concern, and these policies are posted on the intranet and discussed with employees.  Tr. 377.  Peoples Health also has a 1-800 number that employees can call anonymously to report issues.  There is also a link they can email or fax. Tr. 378.

54.     As the former-Director of Human Resources, Ms. Wolff was familiar with FLSA. And she worked to ensure Peoples Health complied with it. Tr. 386.  She did not have any concerns about the lawfulness of the PTO policy, and did not consider anything wrong with it. Tr. 400-01.

55.      The timekeeping policy, Exhibit 73, is different for exempt employees, such as Mr. Jones, and non-exempt employees.  For exempt employees, the purpose of the timekeeping policy was to track when an employee was out of the office and not working, either partial or full days.

**Mr. Jones Works Remotely May 1-5, 2017**

56.      On Friday, April 28, 2017, Mr. Jones sent an email stating that he would be working remotely the following week of May 1-5, 2017.  Tr. 74.

57.     Mr. Graham sent an email on Monday, May 8, 2017, concerning Mr. Jones' lack of activity for the week of May 1-5.  *See* Exhibit 35.  There were no calls, and no weekly report. Tr. 76-77. Based on his interactions, Mr. Graham didn't think Mr. Jones worked at all that week. He based his belief on lack of communication that was required by the email, lack of emails on general business that he would have received. Tr. 184.

58.     On May 8, 2017, Mr. Bonck sent an email showing Mr. Jones' ProviderTrak activity from the prior week.  It showed a total of 12 minutes of activity.  Exhibit 37, Tr. 76.  Mr. Bonck also forwarded Mr. Jones' login time for the VPN for that week.  There were only three logins for May 1 and one login for May 4. Exhibit 36; Tr. 75.

59.     Though Mr. Jones appears to have not been working the week of May 1-5, and he had not complied with the terms of the remote-work arrangement, he was paid his salary for that time.  Tr. 251-52.

60.     While Mr. Jones testified that he provided daily logs for the week of May 1-5 and that he was working this week, there is no objective evidence to support this contention.  Instead, the documents support that Mr. Graham accurately testified as to Mr. Jones' non-compliance with the remote-work arrangement.  Mr. Graham, who kept contemporaneous notes of this timeframe, was not lying as Mr. Jones suggested.  Tr. 358-59; Exhibits 28, 35, 36, 37.

61.     In fact, the documents contradict that Mr. Jones was working.  While he testified the logs from April 10-14 were accurate, Exhibit 29, he also testified that he did not include the research work that he performed.  And, Mr. Jones agreed that someone reviewing these logs would not be able to tell that he was working.  Tr. 358-359.

62.     Further, the weekly reports he submitted contradict his testimony and other objective evidence, such as the VPN records.  The weekly reports notes that he "consistently worked to move ICFs through ProviderTrak and to note relevant information as needed particularly for ICFs awaiting documentation or pending meetings." But he now agreed that he more likely than not did not login to ProviderTrak, as reported.  Tr. 361.

## The Decision to Terminate Mr. Jones

63.     The company made the decision to terminate Mr. Jones during the course of the week of May 8, 2017. The decision was made with input from Human Resources, Ms. Ortego, Mr. Bonck, and Mr. Graham.  Tr. 81.

64.     Mr. Bonck testified that the objective information from the VPN, ProviderTrak, and from Mr. Graham stating that he was not emailing, led him to conclude that Mr. Jones was being dishonest about working.  Tr. 104.  Because of this, he recommended terminating Mr. Jones.  He made this recommendation to Ms. Ortego and Ms. Wolff.  Tr. 106.

65.     Mr. Graham supported the decision to terminate.  He was not aware that Mr. Jones had raised any concern about the FLSA or PTO.  Mr. Jones never mentioned these things to him.  Tr. 184-85.

66.     Ms. Ortego also supported the decision to terminate Mr. Jones. In making this determination, she relied on Mr. Bonck's information on his performance, the VPN and ProviderTrak reports, and Mr. Jones' weekly reports.  Tr. 53. When she provided input on termination Mr. Jones, she did not associate his references to the PTO policy or the FLSA with her decision. Tr. 83. Ms. Ortego testified that even if she recommended firing Mr. Jones, she believed that human resources could overrule her.  Tr. 95.

67.     Ms. Wolff testified that she made the decision to terminate Mr. Jones.  Tr. 398. Ms. Ortego confirmed that Ms. Wolff had the ultimate authority to terminate, but that she had been asked to deliver the message. Tr. 90-91; 96.

68.     In making this decision, Ms. Wolff considered that during the entire remote-work arrangement, there were a number of things that were identified that indicated Mr. Jones was not working.  She learned he was not complying with the parties' agreement.  He wasn't checking in daily and he wasn't turning in reports timely or at all. That concerned her because it wasn't what they had agreed to and it led them to believe or question whether he was doing anything. Tr. 396. One week in particular, he reported that he had been working, but there was zero activity.  After that, she asked Mr. Bonck and Mr. Graham to follow up with the providers that Mr. Jones had written down to see if the interactions had actually taken place and learned they had not.  Based on all of the information, she concluded that Mr. Jones wasn't complying with the terms of the remote-work arrangement.  Tr. 398-99.

69.     Ms. Wolff also determined that Mr. Jones was intentionally deceiving the company.  This violated Peoples Health's code of conduct.  *Id.*  Dishonesty is a ground for termination.  Tr. 400.

70.     Mr. Jones does not dispute:

a.   That the remote-work arrangement provided for him to work remotely 2 weeks out of a 6 week time period, but he worked remotely more than 2 weeks.  Tr. 336, 341.

b.   That the remote-work arrangement required him to send an email to Mr. Graham every day containing a bullet point of what he did, but he did not comply with this requirement. Tr. 345-46.

c.    That the remote-work arrangement required him to accurately maintain his calendar, but he did not comply with this requirement.

d.   That the remote-work arrangement required him to record his time accurately and in the usual fashion.  Tr. 349.

**The May 10, 2017 Termination Meeting**

71.     The meeting to terminate Mr. Jones took place on May 10, 2017.  Again, Mr. Jones secretly recorded this meeting.  Tr. 81. The meeting was held with Macon Moore and Ms. Ortego and they discussed the reason for termination, which was basically that he was not fulfilling the agreement he had put in place to work remotely.  Tr. 43.

72.     Mr. Jones confirmed that in the meeting, the reason Ms. Ortego told him he was being terminated was for not complying with the remote-work arrangement.  Tr. 293.

73.     While Mr. Jones has a different memory of this meeting, again, the audio recording speaks for itself.  *See* Exhibit 49.  Also, the transcript of the meeting was entered as

16

Exhibit 47.  While Mr. Jones points to Mr. Moore's notes of the meeting and his memory to

support the contention that he brought up the FLSA several times in this meeting, this just isn't

supported by the transcript.

74.     Mr. Jones claims that Ms. Ortego said in response to questions about the FLSA

that "we've looked into all of that.  We're not talking about that."  Tr. 302.  But this is not

accurate.  The transcript and recording show that Ms. Ortego said that she had looked into and

followed up on the goals he discussed at the April 24 meeting: "to come to work, to do  your job,

to get questions answered."  Exhibit 47, p. 2.

## CONCLUSIONS OF LAW

1.     The FLSA prohibits an employer from discharging an employee in retaliation for

his having filed a complaint or instituted a proceeding under or related to the FLSA.  29 U.S.C.

§215(a)(3).  For Mr. Jones to succeed on his claim, he bore the burden of proving by a

preponderance of that he engaged in protected activity by filing an FLSA-related complaint and

that Peoples Health terminated his employment for that reason.  Mr. Jones failed to meet this

burden.

## Mr. Jones did not engage in Protected Activity

2.     If a plaintiff cannot prove that he was engaged in protected activity under Section

215(a)(3) of the FLSA then he cannot make out a viable claim under the Act.  To find that a

plaintiff engaged in protected activity, an employee must give his employer "fair notice" that he

"is making a complaint that could subject the employer to a later claim of retaliation."  *Lasater v.

Tex. A & M Univ.-Commerce*, 495 Fed. Appx. 458, 461 (5th Cir. 2012) (per curiam).  The

complaint "must be sufficiently clear and detailed for a reasonable employer to understand it, in

light of **both content and context**, as an assertion of rights protected by the [FLSA] and a call for their protection."  *Lasater*, 495 Fed. Appx. at 461 (emphasis added).

3.     An informal, internal complaint may satisfy this element.   *Trigueros v. New Orleans City*, 17-10960, 2018 U.S. Dist. LEXIS 86496, *7 (E.D. La. 5/23/18) (citing *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008)).  But, "not all 'abstract grumbling' or vague expressions of discontent are actionable as complaints." *Id.* at *7 (quoting *Hagan*, 529 F.3d at 625-26).  "To fall within the scope of the anti-retaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."  *Id.* (quoting *Kasten v. Saint-Gobain Performance Plastics Corp.,* 563 U.S. 1, 14 (2011)); *see also, Boyer v. Pilot Travel Ctrs., LLC*, 05-978, 2007 U.S. Dist. LEXIS 20108, *12 (W.D. Tex. 3/7/07) (rejecting the notion that "nearly any act of an employee in seeking to vindicate his rights bring the employee within the protection of the FLSA's anti-retaliation provision").

4.     Further, the Fifth Circuit has not decided yet whether an employee's good faith belief that his employer has committed an FLSA violation can give rise to protected activity, even though the employer has committed no such violation.  *Hagan*, 529 F.3d at 630; *Lasater*, 495 Fed. Appx. at 463.  But, it has affirmed the dismissal of an FLSA retaliation claim where the plaintiff failed to show that he had a good faith belief that his employer was violating the law. *Galentine v. Tideport Distrib*., 715 Fed. Appx. 394, 395 (5th Cir. 2018).

5.     In this case, the protected activity Mr. Jones alleges he engaged in occurred during the April 24, 2017 meeting with Ms. Ortego.  But Mr. Jones' isolated reference to the FLSA on April 24 does not qualify as protected activity.  Instead, it was more akin to "abstract

grumbling" and a "vague expression of discontent"—which is not legally actionable—than to the filing of an FLSA-related complaint—which is. *Trigueros*, 2018 U.S. Dist. LEXIS 86496 at *7.

6.      Almost all of the 30-minute meeting between Mr. Jones and Ms. Ortego was devoted to Mr. Jones complaining about his supervisors. Then, for a couple of minutes, Mr. Jones made a vague complaint about his PTO and asked a question about whether Peoples Health's paid time off policy was different than other company's PTO policies.  But, as he readily admits, he did not tell Ms. Ortego that he believed Peoples Health's policy was illegal or violated the FLSA or any other law. *See* Exhibit 48, 21:15-23:15; Tr. 24.  And, Ms. Ortego did not understand that Mr. Jones was saying that he thought Peoples Health's PTO policy was illegal.  Tr. 70. Further, at the end of the meeting, Mr. Jones did not ask Ms. Ortego to follow up on any FLSA or PTO complaints. Instead, he identified the goals of the meeting was to be able to come to work, do his job, get his questions answered, be treated as a fair peer.  *See* Exhibit 48, 24:22; Tr. 36. Moreover, Mr. Jones never handed Ms. Ortego any FLSA-related paperwork that would or could have provided any context to his vague grumblings about his lack of PTO. Considering the "content and context" of Mr. Jones' conversation with Ms. Ortego, his comments about the PTO policy were not sufficiently clear and detailed for Ms. Ortego to understand that he was asserting rights under the FLSA or calling for their protection.  Because Mr. Jones has not proved that he engaged in protected activity, he cannot recover under the FLSA, and his claim must be dismissed with prejudice.

### Mr. Jones did not have a good faith basis to
### believe that Peoples Health's PTO policy violated the FLSA

7.      Another consideration in determining whether a Plaintiff has engaged in protected activity is whether that plaintiff had a good faith basis to believe that a FLSA violation was occurring.  In *Hagan*, the Fifth Circuit found that the plaintiff's internal objections and concerns

raised to management about the possibility that field technicians were receiving less overtime pay as a result of an announced schedule change did not constitute engaging in protected activity. *Hagan*, 529 F.3d at 626.  In reaching its determination, the Fifth Circuit noted that the plaintiff had not framed any of his objections in terms of the potential illegality of the schedule change and that the schedule change was not, in fact, illegal.  *Id*.

8.     Courts also have held that conversations between a plaintiff and his supervisor that bear on issues relating to the FLSA do not necessarily constitute engaging in protected activity.  For instance, in *James v. MedicalControl, Inc.*, 29 F.Supp.2d 749, 753 (N.D. Tex. 1998), the court held that the plaintiff did not establish that he engaged in protected activity merely by showing that he had one conversation with his supervisor about his status as an exempt versus a non-exempt employee.

9.     Here, Mr. Jones also did not have a good faith basis to believe that Peoples Health's PTO policy did not comply with the FLSA.  If he sincerely believed the PTO policy was illegal, he could—and should—have raised his concerns with Peoples Health's Human Resources or Compliance departments.  He admits that he did not, even though there were a number of people in the Human Resources department or the compliance department with whom he could have gone.  Tr. 370-71; Tr. 400-01.  He did not use the intranet or anonymous 1-800 number to report these issues. Tr. 378.  Instead, he requested a meeting with someone admittedly not responsible for FLSA compliance and only *after* his supervisors, Mr. Bonck and Mr. Graham, counseled him for failing to honor the terms of his remote work arrangement with the company. Tr. 21, 369.  The timing of the meeting and Mr. Jones' decision to record it secretly are suspicious and strongly suggest that he did not arrange the meeting to raise a genuine

compliance concern, but rather did so to attempt to inoculate himself from discipline or termination.

### Mr. Jones cannot show that but for engaging in protected activity, he would not have been terminated

10.     Under the FLSA, Jones must prove that Peoples Health would not have terminated him "but for" the fact that he engaged in protected activity. *Id*. at *13.  As the United States Supreme Court recognized in *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), when it confirmed that the but-for causation standard should be applied in retaliation cases, the heightened burden is necessary to prevent employees from asserting claims based on their attempts to inoculate themselves from disciplinary action or termination by complaining of alleged unlawful acts.  *See also Kanida v. Gulf Coast Med. Pers., LP*, 363 F.3d 568, 580 (5th Cir. 2004).

11.     To make the required showing that Peoples Health would not have terminated his employment but-for the statements he made to Ms. Ortego during the April 24, 2017 meeting, Mr. Jones cannot simply rely on the temporal proximity between the April 24, 2017 meeting and his May 10, 2017 termination.  *Maynor v. Dow Chemical Co.*, 07-0504, 2010 U.S. Dist. LEXIS 143289, *42 (S.D. Tex. 7/19/10) (citing *Strong v. Univ. Healthcare System, LLC,* 482 F.3d 802, 807-08 (5th Cir. 2007)).  Rather, he must come forward with evidence from which a factfinder could conclude that if he had not made the statements relating to the FLSA during his April 24 meeting with Ortego, Peoples Health would not have terminated his employment.

12.     Indeed, Peoples Health was not required to abandon any contemplated plans to discipline or terminate Mr. Jones just because he chose to request a meeting with Ms. Ortego and to briefly reference the FLSA at that meeting. *See, e.g., Maynor*, 2010 U.S. Dist. LEXIS 143289 at *42-43 (recognizing that Dow was not required to abandon its plans to discipline the plaintiff

for insubordination just because he made an oral complaint about lack of pay and reversing the jury verdict on his FLSA retaliation claim); *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 272 (2001) ("Employees need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality."); *Fanning v. Metropolitan Transit Authority of Harris Cnty.*, 141 F.Appx 311 (5th Cir. 2005) (*per curiam*) (unpublished) (recognizing that employers do not need to suspend previously planned employment actions after learning of an EEOC charge filing).

13.    Mr. Jones cannot demonstrate that he would not have been terminated but for any alleged protected activity.  The evidence shows that Peoples Health had ample evidence to conclude that Mr. Jones was not complying with the terms of his remote-work arrangement. And, on top of that, that Mr. Jones was in fact being dishonest to Peoples Health regarding actual work being performed during the timeframe he was working remotely.  The decision to terminate Mr. Jones was made with input from Human Resources, Ms. Ortego, Mr. Bonck, and Mr. Graham.  Tr. 81. Objective information from the VPN, ProviderTrak, and from Mr. Graham stating that he was not emailing, led him to conclude that Mr. Jones was being dishonest about working.  Tr. 104.

14.    Though input was provided, Ms. Wolff made the ultimate decision to terminate Mr. Jones. Tr. 398.  In making this decision, Ms. Wolff considered that during the entire remote-work arrangement, there were a number of things that were identified that indicated he was not working.  Based on all of the information, she concluded that he wasn't complying with the terms of the remote-work arrangement.  Tr. 398-99. And, she concluded that Mr. Jones was intentionally deceiving Peoples Health. This violated Peoples Health's code of conduct.  *Id.*

15.     Ms. Wolff was not aware of Mr. Jones' mention of the FLSA or concern about PTO.  Neither were Mr. Graham or Mr. Bonck.  Tr. 400-01; Tr. 73-74. And, Ms. Ortego testified that she did not associate his references to the PTO policy or the FLSA with her decision. Tr. 83. Graham supported the decision to terminate.  He was not aware that Mr. Jones had raised any concern about the FLSA or PTO.  Mr. Jones never mentioned these things to him.  Tr. 184-85. Ms. Ortego also supported the decision to terminate Mr. Jones. In making this determination, she relied on Mr. Bonck's information on his performance, the VPN and ProviderTrak reports, and Mr. Jones' weekly reports.  Tr. 53. When she provided input on termination Mr. Jones, she did not associate his references to the PTO policy or the FLSA with her decision. Tr. 83. Ms. Ortego testified that even if she recommended firing Mr. Jones, she believed that human resources could overrule her.  Tr. 95.

16.     Everyone involved in making the decision to terminate Jones' employment denies that any concerns Mr. Jones may have had about Peoples Health's PTO factored into their decision-making process. Mr. Jones has presented no evidence to suggest otherwise, or that he would not have been terminated but for his complaint.  As a result, Mr. Jones cannot recover under the anti-retaliation provision of the FLSA.   And his claims against Peoples Health should be dismissed with prejudice.

Respectfully submitted:

**ADAMS AND REESE LLP**

*/s/ Sara C. Valentine*
ELIZABETH A. ROUSSEL (#27943)
SARA C. VALENTINE (#30773)
701 Poydras, Suite 4500
New Orleans, LA  70139
Telephone:  (504) 581-3234
Facsimile: (504) 566-0210

***Counsel for New Orleans Regional Physician
Hospital Organization, Inc., d/b/a Peoples Health
Network***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 12, 2019, I electronically filed the foregoing with

the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all

counsel of record.

*/s/ Sara C. Valentine*